**PLATTNER VERDERAME PC**
316 E. Flower St.
Phoenix, Arizona 85012
Telephone: (602) 266-2002
Frank Verderame
Arizona State Bar No. 007519
fverderame@plattner-verderame.com
Nicholas A. Verderame
Arizona State Bar No. 030683
nverderame@plattner-verderame.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| DERRITH WATCHMAN-MOORE, Personal Representative of the Esate of Chantal Kelcia Moore, deceased; DERRITH WATCHMAN-MOORE, indivudally as surviving mother; HENRY K. MOORE, individually as surving father; CALLAN DAVID MOORE, individually as surviving brother; CHEYENNE SUMNER MOORE, individually as surviving sister; CERRA DAWN MOORE, individually as surviving sister; CHAEL SKYE MOORE, individually as surviving sister,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, on behalf of it's Agencies and/or Agents; FORT DEFIANCE INDIAN HOSPITAL BOARD, INC., dba FORT DEFIANCE INDIAN HOSPITAL aka TSEHOOTSOOI NAHATA'DZIL HEALTH AND | NO.<br><br><br><br>**COMPLAINT**<br>**[Wrongful Death, Federal Tort Claim]** |

MEDICAL CENTER; CURTIS R. OLSEN, MD and JANE DOE OLSEN, husband and wife; ALITHEA GABRELLAS, MD and JOHN DOE GABRELLAS, wife and husband; ROGER V. BEGAY, MD and JANE DOE BEGAY, husband and wife; CAMMIE OSTER, RN and JOHN DOE OSTER, wife and husband; JOHN AND JANE DOES I-V; BLACK AND WHITE CORPS. I-V; GREY PARTNERSHIPS I-V,

Defendants.

COME NOW the Plaintiffs above named, by and through their attorney undersigned, and for their cause of action against the Defendants, state and allege as follows:

**PARTIES, JURISDICTION AND VENUE**

I.

Derrith Watchman-Moore, as Personal Representative of the Estate of Chantal Kelcia Moore, and individually as decedent's surviving mother; Henry K. Moore individually as surviving father; Callan David Moore individually as surviving brother; Cheyenne Sumner Moore, individually as surviving sister; Cerra Dawn Moore, individually as surviving sister; and Chael Skye Moore, individually as surviving sister; each of whom are plaintiffs to this cause of action.

II.

Upon information and belief, the above named Defendants, and/or their employees and/or their agents, caused events to occur within the State of Arizona, out of which this cause of action arose.

III.

This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680, as hereinafter more fully appears.

IV.

Defendant USA, pursuant to the above-stated provision, is responsible for money damages for personal injury and/or wrongful death caused by the negligent wrongful act or omission of any employee(s) of the United States of America, while acting within the scope of its employment.

V.

The United States District Court for the District of Arizona, has exclusive original jurisdiction of civil actions on claims against the United States of America for money damages for personal injury caused by the negligent wrongful act or omission of any employee of the United States of America, while acting within the scope of employment as alleged herein.

VI.

At all times material hereto, Curtis R. Olsen, MD, Alithea Gabrellas, MD, Roger V. Begay, MD, and Cammie Oster, RN, and others involved in management of this patient, all of whom are believed to have been directly involved in the medical care and treatment of the patient at times relevant to this cause of action, were operating as employees and/or agents of the Fort Defiance Indian Hospital, agency of Defendant USA, and all actions taken by them and pertinent hereto were within the course and scope of agency and/or employment.

. . .

VII.

The Defendant USA is vicariously responsible for the negligent actions of its agency, agents and/or employees.

VIII.

Under the Federal Claims Tort Act, 28 U.S.C. § 2402 does not provide for a jury trial for claims brought against the United States of America. In cases where other private parties are joined as defendants with the United States, a defendant may ask for a jury to consider the claims against the other private defendants, and for advice to the judge regarding claims against the United States. No other such private parties are joined in this matter. As such this matter is to be presented as a trial to the Court.

IX.

Plaintiffs assert that venue is proper in this District pursuant to 28 U.S.C. § 1391(a) due to the Defendants' primary place of business; as well as the location of where the majority or all medical care and treatment occurred.

X.

Plaintiffs have fully complied with the filing of an administrative claim to the responsible federal agency, prior to the initiation of this suit 28 U.S.C. § 5(a).

XI.

More than six months before this action was instituted, the claim set forth herein was presented to the appropriate federal agency, including the U.S. Department of Health and Human Services, Indian Health Services, U.S. Public Health Indian Health Service, Navajo

Area Indian Health Service, and Fort Defiance Indian Hospital Board, Inc.; with the receipt of a letter from Department of Health & Human Services dated March 23, 2017, which constituted the notice of final determination as required by 28 U.S.C. §§ 2401(b), 2675(a), denying the claims. As such, Plaintiffs herein file suit against Defendants within the statutorily allowed time of six months from the date of the denial.

XII.

Defendants John Does I-X, Jane Does I-X, Black Corporations I-X, and White Partnerships I-X, are either residents of the State of Arizona, or caused events to occur within the Fort Defiance (Navajo Nation), State of Arizona, out of which this cause of action arose. These defendants are named fictitiously, and their true names and identities will be added through amendment to this Complaint upon discovery thereof. Plaintiffs are informed and believe and therefore allege that each such defendant may be legally responsible in some manner for the events referred to herein and proximately caused damage to Plaintiffs.

**GENERAL ALLEGATIONS**

XIII.

At all times mentioned herein, Defendant Fort Defiance Indian Hospital Board, Inc., dba Fort Defiance Indian Hospital, aka Tsehootsooi Nahata'Dzil Health and Medical Center, doing business in Arizona (hereinafter referred to as "Defendant FDIH" or "FDIH"), was and still is duly organized and existing under and by virtue of the laws of the State of Arizona, operating and maintaining a hospital located in Fort Defiance, Arizona. At all times pertinent hereto, this Defendant has been engaged in the maintenance and operation of said hospital,

where persons afflicted with illness and disease are provided care and treatment for a consideration.

XIV.

At all times mentioned herein, Defendants Curtis R. Olsen, MD, Alithea Gabrellas, MD, Roger V. Begay, MD, Cammie Oster, RN, and other Hospital personnel, were the apparent, ostensible, implied and/or express agents of and/or were employed by Defendant FDIH, and/or committed independent acts of negligence while employed at FDIH and were acting within the course and scope of said employment and/or agency when the acts hereinafter set forth were committed, thereby imposing vicarious liability upon Defendant FDIH by reason of the doctrine of *respondeat superior* and ostensible agency.

XV.

At all times pertinent hereto, Defendant FDIH represented and held out to the public, and in particular to decedent Chantal Moore, that said Hospital was equipped, qualified and prepared to receive the public, and in particular Chantal Moore, for her treatment and care and that it employed and maintained on its staff skilled and competent physicians, physician assistants, nurses, aides, technicians, therapists, and other healthcare-related personnel to conduct and operate said Hospital.

XVI.

Defendant FDIH was responsible for the operation of its hospital, the selection and supervision of medical staff and for the quality of care rendered in said hospital, pursuant to Arizona law.

XVII.

Upon information and belief, Defendants Curtis R. Olsen, MD and Jane Doe Olsen; Alithea Gabrellas, MD and John Doe Gabrellas; Roger Begay, MD and Jane Doe Begay; and Cammie Oster, RN and John Doe Oster; respectively, are believed to be spouses within a marital community and residents within the State of Arizona.

XVIII.

The actions complained of herein against Defendants Olsen, Gabrellas, Begay, and Oster, are actions performed in the furtherance of their respective marital community, and are therefore binding upon their respective spouses named as Defendants Jane Doe Olsen, John Doe Gabrellas, Jane Doe Begay, and John Doe Oster, whose true names will be substituted by amendment to this Complaint.

XIX.

Defendants Olsen, Gabrellas, and Begay, are duly licensed as medical doctors under the laws of the State of Arizona, and owed a duty of care to decedent Chantal Moore to act in accordance with the applicable standard of care for medical doctors acting under the same or similar circumstances in the same area of medicine. Said physicians held themselves out to the general public as being skilled, careful and diligent in the practice of medicine.

XX.

Defendant Oster is a duly licensed registered nurse under the laws of the State of Arizona, and owed a duty of care to decedent Chantal Moore to act in accordance with the applicable standard of care for a registered nurse.

XXI.

Defendant Curtis Olsen, MD, at all material times hereto, was a licensed, treating physician to decedent Chantal Moore, and is believed by Plaintiffs to practice in the specialty of Family Medicine.

XXII.

Defendant Alithea Gabrellas, MD, at all material times hereto, was a licensed, treating physician to decedent Chantal Moore, and is believed by Plaintiffs to practice in the specialty of Internal Medicine.

XXIII.

Defendant Roger Begay, MD, at all material times hereto, was a licensed, treating physician to decedent Chantal Moore, and is believed by Plaintiffs to practice in the specialty of Family Medicine.

XXIV.

Defendant Cammie Oster, RN, at all material times hereto, was a licensed, registered nurse, providing care to decedent Chantal Moore.

XXV.

At all times material hereto, Defendants Olsen, Gabrellas, and Begay, were actively practicing their profession in the State of Arizona and in doing so, held themselves out to the public and to the decedent as having special skills, knowledge, and training in medical science and/or medical services.

. . .

XXVI.

At all times material hereto, Defendant Oster was actively practicing her profession in the State of Arizona and in doing so, held herself out to the public and to the decedent as having special skills, knowledge, and training in nursing.

XXVII.

In reference to the matters at issue herein, Defendants, for a promised consideration or fee which decedent agreed to pay, undertook to perform and furnish medical care, attention, counsel, treatment, medical procedures, medical supervision, and nursing care, for and to decedent Chantal Moore.  Decedent and Plaintiffs relied upon the Defendant as medical specialists and/or knowledgeable in their respective designated fields and, as such, the relationship of patient and physician and/or patient and nurse, was thereby created.

XXVIII.

Jurisdiction and venue against each of the Defendants is proper.

**FACTUAL ALLEGATIONS**

XXIX.

This cause of action is premised upon negligent acts of Defendant Fort Defiance Indian Hospital Board, Inc., dba Fort Defiance Indian Hospital, aka Tsehootsooi Nahata'Dzil Health and Medical Center (FDIH), and it's physicians and nurses including, but not limited to Curtis R. Olsen, MD, Alithea Gabrellas, MD, Roger Begay, MD, and Cammie Oster, RN, and other presently unknown physicians or healthcare workers of Fort Defiance Indian Hospital.  This action arises out of a claim for Chantal Moore's wrongful death on February 15, 2014.

XXX.

Commencing on or about February 7, 2014, decedent Chantal Moore received substandard, wrongful, and negligent medical care and treatment from the Defendants named above, which directly resulted in her death on February 15, 2014.

XXXI.

On February 7, 2014, at approximately 7:39 p.m., Chantal Moore (27 years old) was admitted to Fort Defiance Indian Hospital. The admitting diagnosis is recorded as pneumonia and Ms. Moore presented with one week of muscle weakness, fatigue, cough, and tachycardia. She carried a diagnosis of polymyositis/overlap rheumatologic disease.

XXXII.

On February 7, 2014, at approximately 8:50 p.m. Nurse Stacey Konow performed a physical assessment of Chantal Moore. As a result of that assessment, Nurse Konow found and recorded in her medical chart that Ms. Moore scored 55 on the Morse Fall Risk scale. A score above 50 identifies a patient with a high risk for falling. Chantal Moore presented a high risk for fall.

XXXIII.

Chantal Moore's muscle weakness and pain continued to increase during her admission and, on February 11, 2014, at 1:40 p.m., Dr. Roger Begay requested a consult from inpatient rehab services. The request states: "Precautions: patient with weakness possible due to deconditioning. Perhaps a psychiatric component. Please evaluate and treat."

. . .

XXXIV.

On the evening of February 12, 2014 at approximately 3:00 a.m., an FDIH Nurse Kathy heard a bang in Ms. Moore's room and found Ms. Moore sitting on the floor. Ms. Moore had fallen. FDIH charge nurse Karen, and FDIH nurse Christina, also came to Ms. Moore's room. Ms. Moore was laid on her back. Ms. Moore denied hitting her head and was alert and oriented. Dr. Obinero was called and updated on Ms. Moore's status. Nurse JAD Concha recorded the fall in Ms. Moore's medical record, and signed her nursing progress notes at 6:58 a.m. on February 12, 2014. Nurse JAD Concha then gave her report to the oncoming nurse.

XXXV.

On February 12, 2014, at 8:45 a.m., Ms. Moore was assessed by Cammie Oster, RN. During that assessment, Nurse Oster documented that Ms. Moore was alert, oriented and cooperative. Nurse Oster further noted Ms. Moore was having difficulty urinating, and that she was attempting to go to the bathroom every 15-20 minutes. After a physical assessment, Nurse Oster documented that Ms. Moore was very weak and required one to two people to assist her. When assessing Ms. Moore's lungs, Nurse Oster documented that she was so weak she had difficulty sitting up for the nurse to listen to lung sounds. Nurse Oster noted, under functional assessment, that she required assistance with activities of daily life ("ADL's"), locomotion and mobility transfers. A fall risk assessment was performed using the Morse Fall Scale. Ms. Moore scored 55, representing a high fall risk. Nurse Oster personally confirmed that Ms. Moore had fallen the night before. Ms. Moore told Nurse Oster that she did not hit her head during the fall. Nevertheless, the fall was not recorded in the Morse Fall Scale.

11

XXXVI.

On or about February 12, 2014, at 11:39 am, physical therapist Robbie Whitehair evaluated Ms. Moore. At that time, she was too weak to participate in physical therapy or in any physical therapy evaluation and, as such, the therapy was delayed. Physical therapist Whitehair determined that Ms. Moore was a fall risk and, as such, required a front-wheeled walker to be placed at her bedside to assist with ambulation safety. Nurse Oster knew that Robbie Whitehair had placed a front wheeled walker at Ms. Moore's bedside and she recorded Ms. Moore using the walker at 11:00 a.m., in her nursing progress notes. Under the Morse Fall Scale the need for an assistive device raises the risk of fall on the risk assessment score.

XXXVII.

On February 12, 2014, at 3:05 p.m., Dr. Olson entered Ms. Moore's room and encouraged her to go to the restroom to void. At 3:10 p.m., Dr. Olson and Nurse Oster assisted Ms. Moore with the walker to the restroom. At 3:30 p.m., Nurse Oster, who was sitting at the nursing station, heard a loud noise coming from Ms. Moore's restroom. Nurse Oster, upon returning to the room, found Ms. Moore having had suffered a violent fall, and actively seizing on the floor of the bathroom. Ms. Moore was found to have suffered a large bump on the back of her head from the fall. Dr. Olsen and Dr. Gabrellas, along with nurse manager Michelle, came to the room. Ms. Moore was able to move all extremities, was moaning, was placed in a wheelchair, and returned to her bed. A CT-scan of her head was ordered, but did not promptly occur. The reason specified for the CT scan was head trauma.

. . .

XXXVIII.

On February 12, 2014, at 4:03 p.m., Ms. Moore suffered another seizure which lasted for 45 seconds. At 4:30 p.m., Ms. Moore was taken to have a CT-scan, and was to be transferred to ICU following the CT-scan. The CT-scan was ultimately performed at approximately 4:35 p.m., which showed bilateral bifrontal and bitemporal posttraumatic intraparenchymal hemorrhages, post traumatic subarachnoid hemorrhage in the frontal lobe, and left temporal intraparenchymal hemorrhage extending into the left temporal horn. At the time, Ms. Moore was mumbling and drooling with spontaneous eye movement.

XXXIX.

On February 12, 2014, at 5:00 p.m., Nurse Matthew Vogt conducted an assessment of Ms. Moore. Part of the assessment included a neurological assessment using the Glasgow Coma Scale. Nurse Vogt documented there was no reaction to light in the right pupil, and that the left pupil reacted slowly. While trying to elicit a verbal response from Ms. Moore, Nurse Vogt recorded that Ms. Moore gave incomprehensible sounds, but no words were spoken. As for motor response, Nurse Vogt recorded abnormal decorticate posturing (a sign of severe brain damage). Ms. Moore's cardiovascular evaluation revealed sinus tachycardia (an abnormally fast heartbeat). The musculoskeletal evaluation is documented with Ms. Moore being weak, having limited range of movement, that she was stiff, and her muscle tone rigid.

XL.

On February 12, 2014, around 5:20 p.m., nearly two hours after her fall and seizure, Ms. Moore was intubated and placed on a respirator. At approximately 6:07 p.m., she was

taken off the respirator by the team that was transferring her to Flagstaff Medical Center.  Ms. Moore was subsequently discharged from the FDIH, and transported to Flagstaff Medical Center on February 12, 2014, at approximately 6:15 p.m.  Ms. Moore's discharge diagnosis was intraparenchymal hemorrhage, and she was discharged in critical condition.

XLI.

On February 12, 2014, upon arrival at Flagstaff Medical Center, a consult was performed by Dr. David M. Sacco.  Dr. Sacco reported his understanding of Ms. Moore's history at FDIH as, "Over the last few days, she began to have issues with urinary retention and yesterday fell while trying go to the restroom.  She did not apparently hit her head.  Today, however, once again she was attempting to go to the restroom when she fell and apparently struck her head and then had a witnessed seizure.  This lasted maybe 5 minutes.  Apparently, she may have had another seizure en route to the CAT scan . . . at some point after the fall she was intubated."  Dr. Sacco's impression at that time was that Ms. Moore had, "intracranial hemorrhage, status post ground level fall with subsequent post traumatic seizures."

XLII.

On February 13, 2014, at 7:39 a.m., the treating physician at Flagstaff Medical Center documented that Ms. Moore had fixed pupils and extensor posturing, both of which are signs of brain damage.  The plan at that time was to perform a decompressive craniotomy (removal of a portion of the skull to relieve pressure), and a right temporal lobectomy (removal of a portion of the brain).  Dr. Sacco performed the surgery on February 13, 2014, at 11:05 a.m.

. . .

#### XLIII.

On February 14, 2014, a palliative care consult was ordered.  Dr. Cynthia Martin informed Ms. Moore's family that her situation was critical, and that she had suffered neurological devastation.  Subsequently, in the death discharge summary, Dr. Sacco reported that Ms. Moore was left with only brain stem function intact; and it was subsequently explained to the family that a person with only brain stem functioning cannot see, speak, or have any personality.  The decision had been made to withdraw Ms. Moore from the ventilator mid-day on February 15, 2014.  Relatives and friends drove to Flagstaff Medical Center to be with Ms. Moore before her passing.

#### XLIV.

As a direct and proximate result of the negligence of the Defendants, Chantal Moore suffered a neurologically devastating brain injury, which directly led to her death on February 15, 2014.

#### XLV.

Defendant FDIH had a duty to protect their patient, Chantal Moore, from harm while a patient at their facility, and failed to do so.  The employees and/or staff of FDIH including, but not limited to, Dr. Olsen, Dr. Gabrellas, Dr. Begay, and Cammie Oster, are, therefore, responsible for their actions as FDIH agents and/or employees, real or ostensible.

#### XLVI.

At all times pertinent, Defendants owed a duty to exercise reasonable care in the care and treatment of Chantal Moore and provide for her medical and nursing needs.

XLVII.

All Defendants named herein, either individually or by and through their duly-authorized agents, servants and/or employees, had the duty to provide competent and qualified medical care, and to properly order and complete appropriate care, treatment, monitoring, fall risk precautions and safety procedures, nursing and staff procedures, and the medically appropriate care and treatment she required; and to render the same in accordance with the standards of the medical community.  Decedent and Plaintiffs relied upon Defendants' covenant to so render competent care.  Defendants breached this duty.

XLVIII.

By reason of the acts and omissions above, Defendants breached their duty to Chantal Moore, which resulted in her fall, devastating brain injury, medical deterioration, and death.

XLIX.

The wrongful acts and omissions by Defendants constitute a reckless disregard for the well-being and safety of Chantal Moore, and evidence conduct that was willful and wanton, which resulted in her death.

L.

Defendant FDIH allowed inadequate and/or incompetent and/or unqualified medical personnel to staff their facility and render direct or indirect medical care to their patients.

LI.

Defendant FDIH failed to properly supervise their staff, including physicians and nurses.

LII.

Defendants failed to adequately score Chantal Moore's risk for fall, and failed to employ adequate precautions to prevent her fatal fall.

LIII.

Defendants failed to timely assess, diagnose, and treat Chantal Moore after her falls and subsequent seizures; and her medical condition progressively worsened during her hospital admission at Defendant FDIH.

LIV.

Although Ms. Moore had already presented as a high risk for fall within Defendant Oster's assessment the morning of February 12, 2014, had the first fall that Ms. Moore sustained on February 11, 2014, been recorded within Defendant Oster's assessment, Ms. Moore would have received a significantly higher fall score recorded in the Morse Fall Scale.

LV.

Had Ms. Moore's symptoms of weakness that were present the morning of February 12th (which led to physical therapist Robbie Whitehair delaying her physical therapy and ordering a front-wheeled walker at her bedside to assist with her ambulation safety) been considered in the Morse Fall Scale, Ms. Moore's score would have placed her at an even higher level of risk for a fall.

LVI.

Defendants owed a duty to Plaintiffs to exercise that degree of reasonable care, skill, and prudence possessed by other licensed health care providers under the same or similar

circumstances. Defendants negligently and carelessly breached its duty to Plaintiffs which resulted in the death of Chantal Moore.

### LVII.

The care, treatment, management, supervision, and practices by the Defendants, in the care and treatment of Chantal Moore, were negligently, carelessly and unskillfully performed. The Defendants fell below the standard of care and skill expected of health care providers in the same or similar circumstances.

### LVIII.

As a direct and proximate result of the negligent acts and omissions by Defendants, Plaintiffs have suffered, and will continue to suffer, the loss of love, affection, companionship, care, support, protection, comfort, and guidance, since the death of their respective daughter and sister, and will continue to suffer such losses in the future.

### LIX.

As a further direct and proximate result of the negligence of Defendants as alleged above, Plaintiffs have individually suffered, and will in the future continue to suffer, pain, grief, sorrow, anguish, stress, shock, and severe and grievous emotional distress.

### LX.

All Defendants named herein, either individually or by and through their duly-authorized agents, servants, and/or employees, had the duty to provide Chantal Moore the services of competent and qualified medical care, to properly order and complete appropriate treatment, and to render the same in accordance with the standards of the medical community.

Plaintiffs relied upon Defendants' covenant to so render competent care. Defendants breached this duty.

### LXI.

In addition to the acts of negligence for which Defendant FDIH is vicariously liable, Plaintiffs assert that FDIH was also actively and/or passively negligent by failing to properly supervise and/or credential physicians making use of hospital facilities.

### LXII.

As a further direct and proximate result of the negligence of Defendants, Plaintiffs have incurred burial and funeral expenses.

### **DEMAND AGAINST DEFENDANTS**

### LXIII.

Plaintiffs are entitled to a judgment in their favor and against the above Defendants named herein, in an amount to be determined by the judge, to be full, fair, and reasonable compensation for the negligent actions and/or inactions provided to Plaintiffs; and Plaintiffs' emotional pain and trauma, anxiety, depression, economic damage, and loss of consortium suffered as a result thereof, plus costs, interest, and attorney fees.

WHEREFORE, Plaintiffs in this action respectfully request that this Honorable Court grant the relief that is just, reasonable, and equitable, against Defendants. Plaintiffs claim actual damages, in an amount to which they are found to be entitled, and pray for judgment against the Defendants, both individually and jointly, as follows:

. . .

1. For general damages in an amount to be proven at trial;

2. For special damages, including but not limited to past and future expenses, and other expenses associated with the death of Chantal Moore;

3. For Plaintiffs' costs and expenses in prosecuting this matter;

4. For Plaintiffs' reasonable attorneys' fees; and

5. For such other and further relief as the court deems fair and appropriate and available pursuant to the Federal Tort Claims Act.

DATED this 14th day of September, 2017.

PLATTNER VERDERAME PC


/s/ Frank Verderame

By_____
FRANK VERDERAME
NICHOLAS A. VERDERAME
316 E. Flower St.
Phoenix, Arizona  85012
Attorneys for Plaintiffs